MARC E. HANKIN (SBN: 170505)
E-Mail: Marc@hpl.law
HANKIN PATENT LAW,
A Professional Corporation
11414 Thurston Cir
Los Angeles, CA 90049
Tel: (310) 979-3600

Attorneys for PLAINTIFF,
**MMAS RESEARCH LLC**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MMAS RESEARCH, LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>MEDICAL CORPORATION TESSHOKAI (KAMEDA GENERAL HOSPITAL); THE UNIVERSITY OF TOKYO; NIHON UNIVERSITY SCHOOL OF MEDICINE; JIMRO CO., LTD.; MITSUBISHI TANABE PHARMA CORPORATION; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-06329-CV (AJRx)<br><br>**FIRST AMENDED COMPLAINT:**<br><br>1. Breach of Contract (Kameda)<br>2. Copyright Infringement (17 U.S.C. § 501) (All Defendants)<br>3. Falsification and Removal of Copyright Management Information (17 U.S.C. § 1202) (University of Tokyo)<br>4. Trade Secret Misappropriation (18 U.S.C. § 1836, DTSA) (All Defendants)<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Cynthia Valenzuela<br>Mag. Judge A. Joel Richlin<br><br>Complaint Filed: July 10, 2025<br><br>Complaint Served: July 29, 2026<br><br>Current Response Date: Sept. 9, 2026 |

Plaintiff MMAS RESEARCH LLC ("MMAS Research," "MMAS," or "Plaintiff"), for its First Amended Complaint against Defendants Medical Corporation Tesshokai, which operates Kameda General Hospital ("Kameda"), The University of Tokyo ("UT"), Nihon University School of Medicine ("Nihon"), and DOES 1 through 10, inclusive, alleges as follows:

**JURISDICTION AND VENUE**

1. This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, including 17 U.S.C. §§ 501 and 1202. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

2. This action also arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367.

3. This Court has personal jurisdiction over each Defendant under Federal Rule of Civil Procedure 4(k)(2). Plaintiff's copyright and trade-secret claims arise under federal law; no Defendant is subject to jurisdiction in any state's courts of general jurisdiction; and the exercise of jurisdiction is consistent with the United States Constitution and laws.

4. Each Defendant purposefully directed its conduct at the United States. Kameda contracted with a United States limited liability company, transmitted the consideration for that contract by wire to a United States bank account, received on-site training from United States personnel, and accessed and uploaded patient assessment data to the Morisky Widget hosted on servers in San Francisco, California. UT published the accused articles in English through publishers that distribute into the United States, deposited one of them in the United States National Library of Medicine's PubMed Central repository, licensed both for unrestricted worldwide reproduction, and had assessment data stored on those same California servers. Nihon published the accused article in English in a journal published by John Wiley & Sons Australia, Ltd on behalf of the Japanese Heart Rhythm Society, which

reproduced, distributed, and publicly displayed the article in the United States through the Wiley Online Library at onlinelibrary.wiley.com, and later withdrew it.

5. In the alternative, and if the Court determines that Rule 4(k)(2) does not supply personal jurisdiction over Nihon, this Court has specific personal jurisdiction over Nihon. The Division of Cardiology, Department of Medicine, Nihon University School of Medicine — the sole institutional affiliation given by every author of the Ablation Study, and the division that designed, conducted, and published it — maintains a continuing research collaboration with the Section of Cardiac Electrophysiology, Division of Cardiology, University of California, San Francisco. Three of the Ablation Study's ten authors are participants in that collaboration. Yasuo Okumura is the corresponding author of the Ablation Study, wrote its first draft, and carried the overall responsibility for the full study and the study protocol; Koichi Nagashima was a substantial contributor to its study concept and design; and Satoshi Hayashida collected the data and conducted the study. Those same three researchers co-authored "A troubling tachycardia," Heart Rhythm 2022;19(6):1031–1032, with Melvin M. Scheinman of the Section of Cardiac Electrophysiology, Division of Cardiology, University of California, San Francisco, and co-authored with that same California collaborator again in "Is the mechanism of these supraventricular tachycardias simply explained by reverse rotation?," Journal of Arrhythmia (2023) — the same journal that published the Ablation Study the following year. That collaboration concerns the same clinical subspecialty and the same procedure as the Ablation Study. The Ablation Study is a catheter ablation study, and radiofrequency ablation was performed in ninety-one of its one hundred thirty-three patients. The Heart Rhythm case is itself an ablation case, in which ablation at the slow pathway and at the coronary sinus roof was attempted, was unsuccessful, and drug therapy was chosen instead. Melvin M. Scheinman holds an endowed chair in cardiology at the University of California, San Francisco, performed the first catheter ablation in a human patient, and continues in clinical practice in complex electrophysiology there.

Nihon's contacts with California are accordingly not incidental to the Ablation Study. They run through the researchers who designed that study, bore responsibility for it, and published it; they lie in the same clinical subspecialty, concern the same procedure performed upon the patients this action concerns, and appear in the same journal; and Plaintiff's claims arising from that study relate to those contacts.

6. Those contacts are Nihon's. A university acts through its faculty. On the face of each of the publications identified in the preceding paragraph, Okumura and Nagashima give one institutional affiliation and one only — the Division of Cardiology, Department of Medicine, Nihon University School of Medicine — and Hayashida gives that same affiliation among his own. None of the three is identified as acting personally, as a consultant, or on behalf of any other institution. Academic research and publication are within the ordinary scope of a medical faculty member's employment. Okumura, moreover, is not merely a member of Nihon's faculty. In answering MMAS Research's notice of infringement concerning the Ablation Study, he wrote over the signature "Professor and Vice Director, Nihon University Itabashi Hospital" — the hospital at which that study was conducted and which granted the institutional review board approval under which it proceeded. Exhibit U. Nihon cannot maintain that the same person acted privately when he collaborated in California and institutionally when he directed the work sued upon. Nihon further supplied the patients, the hospital, and the institutional review board approval under which the Ablation Study was conducted, and the study was performed at Nihon University Itabashi Hospital under that approval. The conduct of those researchers in the collaboration is therefore attributable to Nihon.

7. This Court has jurisdiction over Plaintiff's breach-of-contract claim under 28 U.S.C. § 1367 and under the doctrine of pendent personal jurisdiction, because that claim arises from the same common nucleus of operative fact as the federal claims.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (c)(3). No

Defendant is a resident of the United States and, under § 1391(c)(3), each may be sued in any judicial district. A substantial part of the events giving rise to Plaintiff's claims, including the storage and processing of the assessment data on servers in California, occurred in and had effect in this District.

## INTRODUCTION

9. This action concerns a copyrighted medical assessment used by three Japanese institutions outside the only terms on which its owner licenses it, in clinical studies of patients whose adherence to prescribed medication bore directly on their survival.

10. The work is the Morisky Widget, United States Copyright Registration No. TX 8-816-517, a computer program owned by Plaintiff MMAS Research LLC. The United States Court of Appeals for the Ninth Circuit has confirmed that MMAS Research never transferred that copyright and remains its registered owner. (Memorandum, No. 23-55202 (9th Cir. Mar. 13, 2024).)

11. The Morisky Widget is an original work of authorship under 17 U.S.C. § 103(b). Upon the functional and unprotectable base of the Morisky Medication Adherence Scales, the Widget's authors created a new, protectable layer: original algorithmic logic that renders condition- and medication-specific assessments, decomposes non-adherence into its intentional and unintentional components, and applies a validated three-tier scoring and coding system.

12. MMAS Research licenses that work only through a program that trains and certifies each user and that requires every assessment to be scored, coded, and reported within the Widget software itself. Those requirements are the conditions on which the license is granted. They exist because a misclassified patient is a patient whose non-adherence goes unaddressed.

13. Kameda held such a license. It scored and coded its patients' assessments by hand instead, extended the work to an institution outside its license, and published a study record without the copyright notification its license required.

14. UT never held a license at all, and was never trained or certified. It used the work in three registered studies—two of them evaluations of software UT itself developed inside commercially sponsored programs—then published an article certifying in MMAS Research's own words that it had scored within the Widget and obtained permission. It had done neither. When the results of that trial were published three years later, the adherence measure had been removed from the paper entirely.

15. Nihon never held a license either. It administered the assessment in an unauthorized Japanese translation, devised its own two-tier scoring rule, and published the result in English in a journal distributed in the United States through the Wiley Online Library, which later withdrew the article for want of permission to use the instrument.

16. Each defendant altered the licensed methodology in the same way and to the same effect: by collapsing the Widget's validated coding into a flat count and a cut point, so that patients of medium adherence were recorded as adherent.

17. None of the affected assessments has been re-scored. None of the misclassified patients has been identified. None of their treating clinicians has been alerted. MMAS Research brings this action to remedy the unauthorized use of its work, to correct the record, and to obtain that accounting.

## THE PARTIES

18. Plaintiff MMAS Research LLC is a Washington limited liability company in good standing. MMAS Research is the owner of United States Copyright Registration No. TX 8-816-517 for the "MMAS Research Widget Code" (the "Morisky Widget").

19. Steven Trubow is the principal of MMAS Research.

20. Defendant Medical Corporation Tesshokai operates Kameda General Hospital and is located at 929 Higashi-cho, Kamogawa City, Chiba Prefecture 296-8602, Japan.

21. Defendant The University of Tokyo is a national university corporation

located at 7-3-1 Hongo, Bunkyo-ku, Tokyo 113-8654, Japan. Its affiliated hospital, The University of Tokyo Hospital, and its Graduate School of Medicine are among the institutions through which the conduct alleged herein was carried out.

22. Defendant Nihon University School of Medicine is located at 30-1 Oyaguchi Kami-cho, Itabashi-ku, Tokyo 173-8610, Japan.

23. Plaintiff is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are persons or entities whose true names and capacities are presently unknown to Plaintiff, and that each is in some manner responsible for the acts alleged herein. Plaintiff will seek leave to amend to allege their true names and capacities when ascertained.

## PART ONE — THE MORISKY WIDGET

### A. Ownership and Registration

24. The United States Court of Appeals for the Ninth Circuit, in its memorandum of March 13, 2024 in No. 23-55202, confirmed that MMAS Research "never transferred its copyright and remains the registered owner of the Morisky Widget." A true and correct copy is attached as Exhibit H.

25. United States Copyright Registration No. TX 8-816-517, titled "MMAS Research Widget Code," was registered on December 3, 2019. The registration identifies MMAS Research LLC as the copyright claimant by transfer by written agreement, states a date of creation of 2017 and a first publication in the United States on March 18, 2017, and identifies the authorship as a computer program. A true and correct copy is attached as Exhibit G.

26. Under 17 U.S.C. § 103(b), the Morisky Widget's protected expression is the new authorship contributed by its authors and not any preexisting scale. That new authorship consists of original algorithmic logic that renders condition- and medication-specific assessments, decomposes non-adherence into intentional and unintentional components, applies a validated three-tier adherence scoring and coding system, and maps clinical parameters to that scoring through the selection,

coordination, and arrangement of the program.

27. The preexisting scale on which the Morisky Widget builds is not a fixed questionnaire. It is a generic form that requires adaptation before it can be administered to any patient. Its own instructions state that it is a generic adherence scale and that the name of the health condition should be substituted in each item; its instruction paragraph and six of its eight items carry a placeholder for that purpose. A copy is attached as Exhibit S.

28. The scale states that requirement. It supplies no means of performing it. The Morisky Widget is that means. Its test editor holds each item as a template carrying medication and condition tokens, renders those tokens into a condition- and medication-specific instrument, maintains a separate rendering for each language of administration, and generates the instruction text with the condition supplied. That rendering architecture, and the scoring and coding logic that operates on its output, is the new authorship registered as Registration No. TX 8-816-517.

29. An MMAS-8 administered without that substitution asks the patient about medication in the aggregate. It cannot identify which of a patient's medicines the patient is not taking. In a patient prescribed several drugs of differing consequence, that distinction is the entire clinical value of the measurement.

30. As administered, the program produces a patient-facing assessment instrument that is the intended output of the copyrighted code and a fixation of its expressive selection, coordination, and arrangement. The reproduction of that instrument, and its administration to patients, is a reproduction of the Widget's protected expression, whether or not the administering party logged into the software. A translation of that instrument prepared without authorization is a derivative work within the meaning of 17 U.S.C. § 106(2).

**B. The Licensing Program**

31. MMAS Research licenses the Morisky Widget only through a program that trains and certifies each user and that requires all assessments to be scored, coded,

and reported within the Morisky Widget. Licenses are non-transferable outside the licensed organization, and no outside organization may be extended the Widget without MMAS Research's agreement on terms for training, certification, and pre-payment.

32. Beginning in January 2017, MMAS Research and Donald E. Morisky, then a fifty-percent member of MMAS Research and a co-principal of its licensing program, stated the terms of that program directly and repeatedly to researchers who wrote requesting permission to use the MMAS-8. A representative communication dated April 5, 2017, sent to a requesting researcher with Steven Trubow as an addressee, is attached as Exhibit T. It states that the instrument "requires a license prior to the use of my copyrighted and trademarked scale"; that "Beginning January 2017, all data collection of the MMAS adherence scales must use the Morisky Widget, which is a digital data entry process using any digital electronic device"; that "All MMAS-8 and MMAS-4 licenses are administered through the Morisky Widget"; and that "All MMAS-8 users are required to obtain a signed MMAS-8 license." It directs the requesting institution to Trubow to obtain a lifetime institutional license.

33. The same communication describes what the licensing program supplied that the paper scale did not. It states that the Morisky Widget administers the assessment in over eighty languages; that it automatically scores and reports adherence levels and the risk of intentional and unintentional non-adherence into the licensee's database; and that it offers a selection of one hundred ten condition-specific MMAS-8 tests with validated translations, which it distinguishes expressly from the generic MMAS-8. That is the same distinction alleged at paragraphs 25 through 27 above: the preexisting scale requires the name of the health condition to be substituted into each item, and the Morisky Widget is the means by which that substitution is performed and by which each condition- and language-specific rendering is generated. MMAS Research does not plead the comparative sensitivity

figures recited in that communication as accurate measures of the instrument's diagnostic performance; they are pleaded as terms on which the program was offered and as evidence of what a license conveyed.

34. The terms alleged in paragraph 30 were not particular to the recipient of any one communication. They were the terms of the licensing program itself, applied to every request MMAS Research and Morisky received, and they were in force before each of the administrations alleged in this Complaint.

**C. Copyright Management Information**

35. MMAS Research identifies its work, its ownership, and the terms on which the work may be used through a standard statement it supplies to licensees for inclusion in any publication reporting results generated with the Morisky Widget. That statement reads:

> The MMAS-8 scoring and coding presented in the article were done using the electronic Morisky Widget MMAS-8 Software. Use of the Morisky Widget MMAS-8 software, copyright registration number TX 8-816-517, is protected by US copyright laws. Permission for the use of the Morisky Widget MMAS-8 software is required and was obtained for this research. A license agreement is available from MMAS Research LLC 14725 NE 20th St Bellevue, WA 98007, USA; strubow@morisky.org.

36. That statement is copyright management information within the meaning of 17 U.S.C. § 1202(c). It conveys the title and identification of the work, the name of the copyright owner, the identifying registration number of the work, and the terms and conditions for use of the work.

37. The statement is also a representation of fact. It states that the scoring and coding reported in the article in which it appears were performed within the Morisky Widget software, and that permission for that use was obtained. MMAS Research supplies the statement only to parties for whom both propositions are true.

**D. The Trade-Secret Scoring and Coding**

38. The Morisky Widget's scoring and coding criteria—the selection and arrangement by which item responses are mapped to the intentional and unintentional components of non-adherence and to the validated three-tier adherence coding—are trade secrets of MMAS Research. They derive independent economic value from not being generally known to, and not being readily ascertainable by, others who could obtain economic value from their disclosure or use.

39. MMAS Research maintains the secrecy of those criteria through reasonable measures. The criteria are never published. They are embedded in software to which access is controlled and are disclosed only to personnel who have completed MMAS Research's training and certification program. Licensees are required to perform all scoring and coding within the Morisky Widget rather than by hand, are prohibited from transferring their access outside the licensed organization, and may not extend the Widget to any outside organization without MMAS Research's agreement.

**E. The Widget's Records**

40. The Morisky Widget retains, on MMAS Research's servers, a record of every assessment scored within it. For each assessment the Widget records the individual item responses, an overall adherence score, an intentional non-adherence sub-score, and an unintentional non-adherence sub-score. Because the Widget's method assigns fractional weights, its overall scores include quarter-point values that a flat summation of the eight items cannot produce.

41. Those records establish what the Widget does that a flat summation does not, and they establish, by their absence, what was never scored within it.

**PART TWO — KAMEDA**

**F. The Kameda License**

42. On July 19, 2017, MMAS Research and Kameda entered into the "Morisky Widget Perpetual MMAS License for Medical Corporation Tesshokai, Japan" (the

"License"). The License was signed on behalf of MMAS Research on August 28, 2017 and by Kameda on September 13, 2017. A true and correct copy is attached as Exhibit A.

43. Clause I.A provides that Kameda understands and agrees that MMAS Research asserts that it holds all intellectual property rights in the Morisky Widget software, the Morisky Medication Adherence Scales, the MMAS-8, the MMAS-4, and all MMAS translations (the "Licensor Works"), and that MMAS Research "is authorizing uses of Licensor Work only as described in this agreement."

44. Clause I.B provides that the License "is non-transferable outside of the Medical Corporation Tesshokai but can be used by any Medical Corporation Tesshokai clinician, physician, nurse, pharmacist or staff member with the proper Morisky Widget training and certification."

45. Clause I.C provides that Kameda "can offer free sub-licenses to any health care organization outside of the Medical Corporation Tesshokai anywhere in Japan, if Licensee & Licensor agrees on the terms for training and certification and the pre-payment of tests by the Sub-Licensee."

46. Clause I.D provides that MMAS Research would supply 2,000 copies of the Morisky MMAS-8 and MMAS-4 assessments in Japanese or any other language, and would provide Morisky Widget training and certification on site in Kamogawa City, Japan.

47. Clause I.F provides that, "[b]y special arrangement Licensee can begin a research study … using paper MMAS questionnaires, but must score, code, and report the results through the Morisky Widget after training has been completed."

48. Section II provides that translations of the copyrighted work "will not be granted for any unauthorized use," and that "[i]n presentations and publications Licensee will cite the use of Licensor Works or results there from in a manner appropriate to the context and consistent with academic/scholarly norms."

49. The requirements that all assessments be scored, coded, and reported

through the Morisky Widget, that use be limited to Medical Corporation Tesshokai personnel holding Morisky Widget training and certification, and that no sub-license issue outside Medical Corporation Tesshokai without MMAS Research's agreement, are conditions that define the scope of the limited use MMAS Research licensed. They are not incidental covenants. Use of the Morisky Widget outside those conditions is use MMAS Research never authorized.

**G. MMAS Research's Performance**

50. MMAS Research performed all of its obligations under the License. It delivered access to the Morisky Widget, established a Morisky Widget organization for Kameda with credits for 2,000 MMAS-8 assessments, and supplied Japanese-language MMAS-8 and MMAS-4 assessments.

51. MMAS Research traveled to Kamogawa City, Japan in 2017 and trained and certified nine Kameda personnel in the correct use of the Morisky Widget to administer, score, code, and analyze MMAS-8 assessments. The Morisky Widget certification records for those nine individuals are attached as Exhibit B.

**H. The Heart Failure Study — UMIN000031192**

52. On information and belief, Kameda and UT conducted a study entitled "Effectiveness of Multidisciplinary Medical Team Education for Heart Failure Patients to Improve Their Medication Adherence," with an anticipated start date of February 8, 2018 and a last follow-up date of January 24, 2019 (the "Heart Failure Study").

53. On information and belief, the Heart Failure Study was registered on the Japanese clinical trials registry (UMIN-CTR) under Unique ID UMIN000031192, and the registry record identifies UT as a co-sponsor. The registry record is attached as Exhibit C.

54. On information and belief, UT held no license from MMAS Research, was not authorized to use MMAS-8 translations, and had no personnel trained or certified to administer, score, or code MMAS-8 assessments in the Morisky Widget.

**I. Scoring and Coding Outside the Morisky Widget**

55. Tomoaki Hashimoto was a pharmacist at Kameda General Hospital and the Chief Investigator for the Heart Failure Study. In May 2025, Mr. Hashimoto met with MMAS Research and with his former supervisor at Kameda General Hospital, Osamu Yasumuro, Chief of the Pharmacy Room.

56. MMAS Research recorded the statements Mr. Hashimoto made, and presented them in writing to Kameda on or about May 15, 2025. Exhibit D. The statements are set forth verbatim below.

57. Mr. Hashimoto stated:

> Tomoaki stated that pharmacists administering MMAS-8 paper tests to patients wanted to provide immediate feedback to patients, so the MMAS-8 tests were scored and coded manually on the spot to give patients advices on how to improve adherence to their medications. Tomoaki freely admitted that MMAS-8 tests were scored and coded outside of the Morisky Widget.

58. On information and belief, when MMAS-8 assessments were administered to patients in the Heart Failure Study, Kameda personnel manually scored and coded those assessments outside the Morisky Widget so that they could give patients immediate feedback on how to improve adherence to their medications.

59. On information and belief, Kameda administered an assessment instrument that was not the Morisky Widget instrument MMAS Research supplied under Clause I.D of the License, and applied to it a flat summation of item responses.

60. A flat summation is not the Morisky Widget's scoring and coding. The Widget's validated methodology decomposes item responses into the intentional and unintentional components of non-adherence and assigns a three-tier adherence coding. Substituting a flat summation for that methodology alters the licensed work and produces adherence classifications the Widget would not produce.

61. On information and belief, Kameda did not report the results of the Heart

Failure Study assessments through the Morisky Widget as Clause I.F required.

**J. Disclosure of the Scoring and Coding Criteria to UT**

62. Mr. Hashimoto further stated:

> Tomoaki stated in front of four or five of his ex-colleagues at Kameda, that he shared the trade secret Morisky Widget MMAS-8 scoring and coding criteria with his co-investigators from the University of Tokyo.

63. Mr. Hashimoto further stated:

> Tomoaki stated that Tokyo University administered scored and coded MMAS-8 tests in the study.

64. Each of the foregoing statements was presented to Kameda in writing on or about May 15, 2025. Exhibit D. Kameda has never disputed any of them.

65. On information and belief, Kameda disclosed the Morisky Widget MMAS-8 scoring and coding criteria to its co-investigators at UT without the knowledge or permission of MMAS Research.

66. On information and belief, personnel at UT thereafter used the Morisky Widget scoring and coding criteria to administer, score, and code MMAS-8 assessments in the Heart Failure Study.

67. MMAS Research never agreed with Kameda on terms for the training, certification, or pre-payment of tests by UT, and never authorized any sub-license, transfer, or extension of the License to UT.

**K. Publication on the Registry Without Copyright Notification**

68. On information and belief, Kameda published information concerning the Heart Failure Study on the Japanese clinical trials registry without the copyright notification the License required, and without citing the use of the Licensor Works in a manner appropriate to the context and consistent with academic and scholarly norms.

**L. Notice and Failure to Cure**

69. In April and May 2025, MMAS Research contacted Kameda concerning

the Heart Failure Study. On May 12, 2025, Osamu Yasumuro identified himself as the primary contact for the matter on behalf of Kameda General Hospital and asked MMAS Research to identify the specific conduct alleged to violate the License, the contractual basis for each allegation, and the corrective measures sought. The correspondence is attached as Exhibit F.

70. MMAS Research answered those questions in writing and in a presentation delivered to Kameda on or about May 15, 2025, which set out the operative License clauses and the conduct alleged to breach them. Exhibit D.

71. On May 17, 2025, MMAS Research transmitted to Kameda a written Addendum to the License, effective June 4, 2025, which recited the breaches alleged, provided for the re-scoring and re-coding of all paper MMAS-8 assessments performed for the Heart Failure Study in the Morisky Widget, provided for MMAS Research to certify that re-scoring and re-coding, and provided for a data transfer agreement addressing the assessment data stored on servers in California. The Addendum is attached as Exhibit E.

72. Kameda acknowledged receipt of the Addendum on May 22, 2025. Kameda did not execute it, and the re-scoring and re-coding it provided for has never occurred.

**M. The Registered Endpoint, the Registry Record, and the Forty Participants**

73. The registry record for the Heart Failure Study states the study's primary outcome measure to be the "Level of adherence classification (High, Medium, Low) evaluated by the Morisky Medication Adherence Scale 8-items (MMAS-8)." Exhibit C. The classification Kameda registered as the measure of its primary outcome is the three-tier adherence coding described at paragraph 60 above. It is not a flat summation. The scoring alleged at paragraphs 58 through 60 accordingly departs not only from the method the License required, but from the endpoint Kameda itself registered before the study began.

74. The same registry record states, under the heading "Results Delay Reason," "Due to incorrect use of MMAS-8 and VAS, accurate results could not be shown." Exhibit C. That record gives the recruitment status of the study as terminated, the publication of results as unpublished, and the number of participants the trial enrolled as forty, against a target sample size of forty. The record was last modified on February 14, 2020.

75. Kameda therefore recorded, on a public clinical trials registry and more than five years before this action was commenced, that the MMAS-8 had been used incorrectly in the Heart Failure Study and that accurate results could not be shown in consequence. On information and belief, no assessment administered in that study has since been re-scored; no participant whose adherence classification was affected has been identified; and no treating clinician has been told that an adherence classification recorded for a patient was produced by a measurement the institution had itself determined to be incorrect.

76. The forty participants were patients admitted to hospital with acute heart failure, each taking at least one medication for heart failure or for a condition causing it, and each required by the study's own inclusion criteria to have the capacity to consent. Exhibit C. They gave that consent and were enrolled upon their institution's assurance that the research would be conducted for their benefit and without avoidable harm to them. Those are the obligations of beneficence and of non-maleficence, and they are owed to the participant rather than to the literature. Beneficence required that the research be conducted for the participants' benefit. Non-maleficence required that it not expose them to unjustifiable risk. Neither obligation ended when the study was terminated, and neither ended when its results went unpublished.

77. The stated purpose of the study, as registered, was to investigate medication adherence in heart failure patients and to clarify the effectiveness of multidisciplinary medical team education in improving it, with adherence evaluated

after discharge at a first and a second visit. Exhibit C. A participant recorded as adherent is a participant whom an intervention directed at improving adherence passes over. MMAS Research does not allege that any identified participant suffered harm; it has no access to the records from which that could be known. It alleges that the assessments were administered, that Kameda holds them, and that they can be re-scored.

## PART THREE — THE UNIVERSITY OF TOKYO

### N. UT Has Never Been Licensed, Trained, or Certified

78. UT has never entered into any license agreement with MMAS Research for the Morisky Widget, the Morisky Widget MMAS-8, or any translation of either.

79. MMAS Research trains and certifies individuals. It licenses organizations. Certification qualifies the individual to operate the Morisky Widget under a license held by the organization that employs or engages that individual; it is not itself a grant of any right to use the work, and it confers no authority on an unlicensed institution.

80. On August 9 and 10, 2018, MMAS Research conducted a Morisky Widget training and certification session in Tokyo in connection with the DialBetesPlus study. Eight individuals were certified and issued Morisky Widget accounts. The certification records are attached as Exhibit Q.

81. Two of the eight accounts certified in that session belong to UT personnel. One was registered to an address on the University Hospital Medical Information Network, the academic network through which UT faculty are addressed and through which the principal investigator of the DialBetesPlus trial is identified on the clinical trials registry. That address is constructed in the same form as the address by which the principal investigator of the DialBetesPlus trial is identified on the registry — an initial, a surname, and the suffix denoting the University of Tokyo. On information and belief, it is the address of Kana Miyake. The other was registered to a personal electronic mail address which, on information and belief, is the address of Yuki Kawai.

82. On information and belief, both individuals certified from UT are among the named authors of the 2021 protocol article described below — the article that certifies that the assessments it reports were scored within the Morisky Widget and that permission for that use was obtained — and are among the named authors of the 2024 results article from which the MMAS-8 was omitted. Yuki Kawai is the first named author of the 2021 protocol article, and Kana Miyake is a named author of it. Exhibit I. Kayo Waki, the principal investigator identified for the DialBetesPlus trial on the clinical trials registry, is also a named author of that article.

83. No license to UT accompanied those certifications, and MMAS Research granted none. The remaining six of the eight certified accounts were issued to personnel of a commercial pharmacy operator engaged to support the study. A further account, created the previous day, belonged to MMAS Research's own administrator and is not among the eight.

84. The certification records also show what each account did with the Widget thereafter. Of 369 assessments scored across all eight certified accounts, 320 were scored by a single account belonging to the commercial pharmacy operator. The two UT accounts scored fourteen and seven respectively. One certified account scored none at all.

85. Those certifications are significant for a further reason. The training and certification program instructs each participant in the requirement that every MMAS-8 assessment be scored, coded, and reported within the Morisky Widget, and in the fact that use of the work requires a license from MMAS Research. UT therefore had actual knowledge, through two individuals it presented for that training, of the rule its studies departed from and of the permission its publication would later claim to have obtained.

86. The certification session also postdates the commencement of both UT studies. The GlucoNote study was registered with an anticipated start of May 14, 2018. Recruitment for the DialBetesPlus trial opened on July 1, 2018. Neither study

waited for the training on which the obligation to score within the Widget depends.

87. MMAS Research has never granted UT permission to prepare, reproduce, translate, distribute, publicly display, administer, score, or code the Morisky Widget MMAS-8, and has never authorized UT to publish any statement that such permission was obtained.

**O. UT Developed and Owns the Software the Accused Studies Were Designed to Validate**

88. On information and belief, GlucoNote is a smartphone self-management support application for patients with type 2 diabetes and prediabetes, built on Apple's ResearchKit framework and developed by UT, originating in departments of its Graduate School of Medicine including the Department of Ubiquitous Health Informatics and the Department of Prevention of Diabetes and Lifestyle-Related Diseases.

89. On information and belief, DialBetesPlus is a self-management support system developed by UT and operated from a UT-controlled server, and is described by its own authors as a research product that would require an industry partner to develop into a production application.

90. The UT studies described below were not disinterested academic inquiry into an existing treatment. Two were designed to evaluate the efficacy of software UT itself had developed. The MMAS-8 was the measure of medication adherence within those evaluations—the metric by which the performance of UT's own product was to be assessed.

91. On information and belief, the UT departments that developed and evaluated those applications are commercially sponsored. The registry record for one of the accused studies states that the responsible UT division is engaged in a cooperative program between The University of Tokyo and NTT DOCOMO, Inc., a commercial mobile telecommunications carrier, and identifies the category of the funding organization as a profit organization. The competing-interests statement of

the 2024 results article states that three of its authors, including the trial's principal investigator, were members of a cooperative program between The University of Tokyo and NTT DOCOMO during the study. The conflict-of-interest statement of a 2019 publication concerning GlucoNote states that the Department of Prevention of Diabetes and Lifestyle-Related Diseases is in a cooperative program between The University of Tokyo and Asahi Mutual Life Insurance Company.

92. On information and belief, the registry record for one of the accused studies further identifies additional commercial funding organizations, and records the nationality of the funding organization, in its English-language field, as the United States.

93. On information and belief, the 2024 results article states that the trial was supported by a grant of the Japan Agency for Medical Research and Development, grant JP19ek0210095, and additionally by NTT DOCOMO, Inc.

94. UT's use of the Morisky Widget MMAS-8 was accordingly commercial in character. It was deployed to generate the evidence base for software developed within corporately sponsored UT programs, and it produced that evidence base: the 2024 results article reports that the trial met its primary endpoint and characterizes the finding as the first of its kind.

**P. The GlucoNote Study — UMIN000032441**

95. On information and belief, UT sponsored and conducted a study registered on the Japanese clinical trials registry as UMIN000032441, entitled in its English field "To study the association between vital data at home and lifestyle using GlucoNote, a smartphone based self-management support application for type 2 diabetes patients and prediabetes people." The registry record is attached as Exhibit L.

96. On information and belief, the registry record identifies The University of Tokyo as the sponsoring institution, identifies the study's principal investigator as a member of the faculty of The University of Tokyo Hospital, and identifies the

reviewing ethics body as the Office for Human Research Studies of the Graduate School of Medicine and Faculty of Medicine of The University of Tokyo.

97. On information and belief, the study was interventional in design, single-arm and non-randomized, with a registered target sample size of 50, and provided for three months of application-based self-management together with medication and lifestyle guidance delivered by pharmacists.

98. On information and belief, the registry record lists medication adherence measured by the MMAS-8 among the study's key secondary outcomes, to be compared between the start and the end of the study.

99. On information and belief, the study protocol was fixed on March 25, 2018, was approved by the reviewing ethics body on May 10, 2018, and was registered on May 1, 2018, with an anticipated start on May 14, 2018 and a last follow-up date of May 9, 2023.

100. On information and belief, the registry record has not been modified since May 2, 2020, records the study's recruitment status as suspended, and records the publication of its results as unpublished. No results of that study have been reported.

101. On information and belief, MMAS-8 assessments were administered in that study and were scored and coded outside the Morisky Widget.

**Q. The DialBetesPlus Study — UMIN000033261**

102. On information and belief, UT sponsored and conducted a randomized controlled trial entitled "Efficacy of the Self-management Support System DialBetesPlus for Diabetic Kidney Disease," registered on the Japanese clinical trials registry as UMIN000033261. The registry record is attached as Exhibit K.

103. On information and belief, the trial protocol and informed consent form were approved by the Research Ethics Committee of the Graduate School of Medicine of The University of Tokyo. The trial was registered by UT, its principal investigator was a member of the faculty of The University of Tokyo Hospital, and its listed sponsoring institution is The University of Tokyo.

104. On information and belief, the trial was conducted at eight hospitals in Japan, enrolled 159 patients beginning July 1, 2018, completed enrollment on August 31, 2019, randomized 132 patients, analyzed 126, and concluded on April 6, 2021 upon completion of the final patient's week 72 follow-up.

105. On information and belief, the registry record for UMIN000033261 lists medication adherence measured by the MMAS-8 among the trial's key secondary outcomes.

106. On information and belief, MMAS-8 assessments were administered to trial participants at enrollment and at follow-up, and were scored and coded outside the Morisky Widget using a flat summation of item responses.

**R. The 2021 Protocol Publication and Its False Certification**

107. On information and belief, UT published the DialBetesPlus trial protocol in the English-language, open-access journal JMIR Research Protocols on August 17, 2021, at 10(8):e31061, doi 10.2196/31061, following an earlier preprint of the same work first published on June 8, 2021. The article is attached as Exhibit I.

108. The published article states that diabetes medication adherence was monitored using the eight-item Morisky adherence scale, schedules MMAS-8 collection at registration and at follow-up, and provides that changes in MMAS-8 scores would be analyzed statistically against the control group.

109. The published article carries, at the conclusion of its discussion, MMAS Research's copyright management information in the exact form set out above—identifying the Morisky Widget MMAS-8 Software, Registration No. TX 8-816-517, MMAS Research LLC as the source of a license agreement, and MMAS Research's address and electronic mail address.

110. That information, as published by UT, was false in two respects.

111. First, the article states that the MMAS-8 scoring and coding presented in it were done using the electronic Morisky Widget MMAS-8 Software. On information and belief, they were not.

112. Second, the article states that permission for the use of the Morisky Widget MMAS-8 software was required and was obtained for this research. On information and belief, no such permission was ever sought from or granted by MMAS Research to UT.

113. On information and belief, UT knew when it published the article that it held no license from MMAS Research, and knew through the two individuals it presented for training and certification that a license is required and that assessments must be scored and coded within the Widget. On information and belief, UT further knew that the assessments reported in the article had not been so scored or coded.

114. The article was published under a Creative Commons Attribution license, under which UT granted the public at large the right to use, distribute, and reproduce the article, including the false certification of permission, in any medium without limitation.

115. On information and belief, the article was deposited in and remains available from the United States National Library of Medicine's PubMed Central repository, and has been cited and reproduced in subsequent publications.

**S. MMAS Research's Own Records Show What Was Never Scored in the Widget**

116. For the DialBetesPlus trial, MMAS Research's records contain 86 assessments for 41 patients, drawn from four facilities. The records are attached as Exhibit M.

117. The trial was conducted at eight institutions and its results article reports 126 patients analyzed. The four facilities represented in the Widget records are those at which the assessments were administered by pharmacists supporting the study. The four institutions at which the study was administered by health care providers at the patients' own hospitals—including The University of Tokyo Hospital itself—are not represented in the Widget records at all.

118. For the GlucoNote study, MMAS Research's records contain 10

assessments for 5 patients, against a registered target sample size of 50. The records are attached as Exhibit N.

119. On information and belief, the participant identifiers appearing in the GlucoNote records are sequential and fall in a range indicating an enrolled application population substantially larger than the registered target sample size of that study.

120. The certification published in the 2021 protocol article states that the MMAS-8 scoring and coding presented in that article were done using the electronic Morisky Widget MMAS-8 Software. MMAS Research's own records show that statement to be false as to the majority of the assessments the article reports, and false as to every assessment administered at UT's own hospital.

121. On information and belief, the assessment data that was uploaded to the Morisky Widget was stored on servers located in San Francisco, California, and remained there.

**T. The 2024 Results Publication and the Suppression of the MMAS-8 Outcome**

122. On information and belief, UT published the results of the DialBetesPlus trial in the English-language journal npj Digital Medicine at 2024;7:104, doi 10.1038/s41746-024-01114-8, received July 23, 2023, accepted April 15, 2024, and published online April 27, 2024. The article is attached as Exhibit J.

123. The results article reports the same trial. It cites the 2021 protocol article as its own authority for the trial design, reproduces a figure from that article, reports the same registration number, the same eight institutions, the same recruitment window, and the same enrolled population.

124. Twenty-one of the twenty-five authors of the 2021 protocol article are also authors of the 2024 results article. Six of the UT-affiliated authors of the protocol article are authors of the results article. The trial's principal investigator is the corresponding author of both.

125. The results article states that all authors had access to the final study results, and identifies its principal investigator as the guarantor of the work, with full access to all the data in the study and responsibility for the integrity of the data and the accuracy of the data analysis.

126. The MMAS-8 was an outcome the trial committed in advance to measure. The 2021 protocol article schedules MMAS-8 administration at registration and at follow-up, states that diabetes medication adherence would be monitored using that instrument, and specifies the statistical test by which changes in MMAS-8 scores would be compared between the intervention and control groups. The registry entry lists medication adherence measured by the MMAS-8 among the trial's key secondary outcomes.

127. On information and belief, those assessments were administered. The results article reports high retention—126 patients analyzed, with 62 intervention and 60 control patients providing data at twelve months and 60 and 60 at eighteen months—across the same visits at which the protocol scheduled MMAS-8 collection.

128. The results article does not report the MMAS-8. It does not report any medication adherence score. It does not state that the MMAS-8 was administered, does not present MMAS-8 data, does not analyze MMAS-8 data, and does not mention the MMAS-8 at any point in its text, tables, figures, or supplementary materials.

129. The results article offers no explanation for the omission. It does not state that the data were unavailable, that collection failed, that the instrument was withdrawn, or that the outcome was abandoned.

130. The omission was selective. Two other licensed patient-reported instruments were administered on the same schedule, at the same visits, to the same patients—the Japanese versions of the Summary of Diabetes Self-Care Activities Measure and the Audit of Diabetes-Dependent Quality of Life. Both are reported in the results article. Both are analyzed. Both are named in the statistical analysis

section. Only the MMAS-8 disappeared.

131. The results article expressly acknowledges the license for one of those other instruments, stating that use of the Audit of Diabetes-Dependent Quality of Life was licensed by its author. It contains no corresponding acknowledgment of MMAS Research, no reference to the Morisky Widget, and no reference to Registration No. TX 8-816-517.

132. On information and belief, the results article was submitted for publication on July 23, 2023, and was accepted on April 15, 2024. The published validation on which a flat summation of the MMAS-8 rests was retracted on August 18, 2023—between those two dates.

133. The results article reproduces a figure first published in the 2021 protocol article, under the Creative Commons Attribution license attached to that article, without the copyright management information the protocol article carried. The results article is itself distributed under a Creative Commons Attribution license permitting unrestricted reproduction.

134. The consequence of the omission is that the only public record of the MMAS-8 in this trial is the 2021 protocol article—the article carrying the false certification that the assessments were scored within the Morisky Widget and that permission had been obtained.

## PART FOUR — NIHON

### U. Nihon Has Never Been Licensed, Trained, or Certified

135. Nihon has never entered into any license agreement with MMAS Research, has never been trained or certified by MMAS Research, has never accessed the Morisky Widget, and has never been authorized to prepare, reproduce, translate, administer, score, or code the Morisky Widget MMAS-8.

136. The terms of the licensing program were stated publicly and repeatedly beginning in January 2017, as alleged at paragraphs 30 through 32 above and shown in Exhibit T. On information and belief, Nihon administered the MMAS-8 in

connection with ablations performed between July 2019 and March 2020, more than two years after those terms were stated. On information and belief, Nihon at no time requested permission, applied for a license, or sought training or certification from MMAS Research.

**V. The Atrial Fibrillation Ablation Study**

137. On information and belief, Nihon published an article entitled "Clinical implication of the patient's disease awareness and adherence to medications in patients undergoing atrial fibrillation ablation," Journal of Arrhythmia 40(1):57–66 (2024), first published online December 6, 2023 (the "Ablation Study"). The article is attached as Exhibit O.

138. On information and belief, in the Ablation Study Nihon administered the MMAS-8 in a Japanese-language translation and reported it as its measure of medication adherence, before and one year after atrial fibrillation ablation.

139. The Japanese-language instrument Nihon administered is a translation of the Morisky Widget MMAS-8 and a derivative work under 17 U.S.C. § 106(2). Nihon was not authorized to prepare, reproduce, or distribute it.

140. On information and belief, Nihon administered the MMAS-8 to each of the one hundred thirty-three patients twice — within one week before the ablation and one year after it — for two hundred sixty-six administrations.

141. On information and belief, the instrument Nihon administered carried no substitution. Every placeholder for the health condition was removed rather than filled. The instrument as Nihon published it asks the patient about "medications," "medicines" and "your condition," and names no drug and no disease anywhere.

142. The patients in the Ablation Study were all prescribed oral anticoagulants. They were also prescribed antiarrhythmic drugs, and the study reports hypertension in a majority of one group, together with diabetes and dyslipidaemia across the cohort. An instrument that asks about medication in the aggregate cannot distinguish a patient who has stopped taking an anticoagulant from a patient who has missed a

statin.

143. The Ablation Study nevertheless concludes that emphasising the importance of anticoagulant therapy may be a modifiable factor for reducing the risk of recurrence. Its measurement never named the anticoagulant.

144. On information and belief, as stated in the Ablation Study's methods, the authors observed a median MMAS-8 score of six in the cohort and, on that basis, defined a score of six or greater as good adherence and a score below six as poor adherence.

145. That two-tier rule is neither the flat summation used with the static MMAS-8 nor the validated three-tier scoring and coding of the Morisky Widget. It is an unauthorized derivative of the instrument as administered, departing from both.

146. On information and belief, under that rule the Ablation Study classified only twenty-six of one hundred thirty-three patients as having poor adherence, and recorded the remaining one hundred seven patients—including every patient scoring six or seven, who are of medium adherence under the validated coding—as adherent.

147. On information and belief, Nihon published the eight items of the instrument in full, in English, as Supplementary Table 2 to the Ablation Study, under the heading "Items of the 8-Item Morisky Medication Adherence Scale." A copy is attached as Exhibit R. That table carries no attribution to any owner, no identification of any registration, no statement that permission was required or obtained, and no answer options by which any reader could score what it printed.

148. The instrument's own terms require such a footnote. Exhibit S provides that a stated footnote is required on the first table or figure in any publication or presentation that presents the MMAS-8, that permission for use of the scale and its coding is required, and that a licence agreement is available. It further requires that specified sources be cited in any publication of results. On information and belief, the Ablation Study carried none of them.

149. What Nihon administered was not the instrument as its copyright holder

published it. The published form carries an instruction paragraph directing the respondent to answer each item by reference to the medication prescribed for a named health condition; it carries the health-condition placeholder within the items themselves; it carries the response options by which the eighth item is standardized; and it carries the required footnote and the required citations. Exhibit S. The instrument Nihon administered and published carried none of them. The instruction paragraph is absent. The placeholders were removed rather than filled. The response options are absent. The footnote and the citations are absent.

150. Nor was the instrument Nihon administered in the language of the published form. It was rendered into Japanese, and neither the rendering nor its administration, scoring, or coding was ever authorized, and no person at Nihon was trained or certified in any of them. Nihon accordingly did not use a published instrument upon its published terms. It prepared and used an altered instrument of its own, in a language of its own, and then published the altered English text of that instrument as Supplementary Table 2.

151. The Ablation Study cites one authority, and one only, for its use of the MMAS-8. That authority is Castellucci LA, Shaw J, van der Salm K, Erkens P, Le Gal G, Petrcich W, Carrier M, "Self-reported adherence to anticoagulation and its determinants using the Morisky medication adherence scale," Thrombosis Research 2015;136:727–731, appearing as reference 9. A copy is attached as Exhibit V.

152. That paper does not support the use Nihon made of it. It reports the four-item Morisky scale rather than the MMAS-8; it reproduces those four items in full and defines adequate adherence as a negative answer to all four of them; and it cites for that scale Morisky, Green and Levine, Medical Care 1986;24(1):67–74. It states in its methods that the four-item scale "has not been validated for anticoagulation adherence" and that it was first validated in outpatients on antihypertensive therapy, and it states in its conclusion that the scale has not been validated for that purpose. It states further that the scale provides no direct or objective assessment of adherence

but reveals a patient's attitudes toward medication.

153. The same paper supplies the measurement against which Nihon's result may be read. In five hundred anticoagulated outpatients it found adequate anticoagulation adherence of 56.2 percent among patients taking vitamin-K antagonists and 57.1 percent among patients taking direct oral anticoagulants, and it observed that the adherence rates above ninety percent reported in clinical trials are artificially inflated by patient selection and intensive follow-up. Nihon, applying its own two-tier rule to a cohort in which every patient was prescribed an oral anticoagulant, recorded one hundred seven of one hundred thirty-three patients — 80.5 percent — as adherent.

**W. United States Publication and Withdrawal**

154. On information and belief, the Ablation Study was first published online on December 6, 2023 on the Wiley Online Library, at onlinelibrary.wiley.com, by John Wiley & Sons Australia, Ltd on behalf of the Japanese Heart Rhythm Society, and was from that date reproduced, distributed, and publicly displayed in the United States through that platform, under a Creative Commons Attribution licence permitting unrestricted reproduction in any medium.

155. The Ablation Study was subsequently withdrawn. The withdrawal notice is attached as Exhibit P. It states that the article has been withdrawn by agreement between the authors, the Editors in Chief, the Japanese Heart Rhythm Society, and the publisher, and that "[t]he withdrawal has been made because the authors had not obtained permission to use the MMAS-8 scale reported in the article." It concludes: "The authors apologize for this error."

156. The withdrawal was therefore not imposed on Nihon. Its own authors agreed to it, on the stated ground that they had no permission, and apologised for it in print.

157. The withdrawal removed the article from the scientific literature but did not re-score the affected patients' responses, identify the records in which a non-

adherent patient was recorded as adherent, or alert the treating clinicians.

**X. Notice, the Unperformed Undertaking, and the Removal of the Record**

158. In April 2025 MMAS Research notified Nihon that the Morisky Widget MMAS-8 had been used in the Ablation Study without license or permission. The Ablation Study's corresponding author, Yasuo Okumura, responded on April 15, 2025 and in further communications through May 5, 2025. He wrote over the signature "Professor and Vice Director, Nihon University Itabashi Hospital." The communications are attached as Exhibit U.

159. In those communications Dr. Okumura stated that the Ablation Study had been "conducted and written by a graduate student under my academic supervision," and that at the study's initiation in 2019 there had been "no accessible information regarding licensing procedures for the Japanese version of the MMAS-8," which was "already in use in several academic papers without license disclosure." The terms of MMAS Research's licensing program had by then been stated publicly and repeatedly for more than two years, as alleged at paragraphs 30 through 32 above and shown in Exhibit T.

160. On April 22, 2025 Dr. Okumura wrote that Nihon was "in the process of preparing a formal corrigendum for submission to the journal to remove all MMAS-8-related content from the article." In the same communication he denied that anything was owed to MMAS Research, on the stated ground that "the relevant data will no longer be used or available." Exhibit U.

161. No corrigendum was submitted. On May 5, 2025 Dr. Okumura stated that the matter had been referred to Nihon University and to the journal's editorial office and that he would engage in no further individual correspondence. Nihon thereafter conducted the matter as an institution.

162. This action was commenced on July 10, 2025. Eleven days later, on July 21, 2025, the Ablation Study was removed from the scientific literature in its entirety. Removed with it were Supplementary Table 2, which reproduced the eight items of

the instrument, and the article's methods, which stated the two-tier rule the authors applied — the only two published sources from which the misclassification alleged above could be established.

163. The withdrawal notice discloses one ground and one only: that the authors had not obtained permission to use the MMAS-8. Exhibit P. It does not disclose that adherence was classified on a rule derived from the study's own sample; that the rule placed a patient scoring six or seven — within the instrument's validated medium-adherence band — in the same category as a patient scoring eight; that one hundred seven of one hundred thirty-three patients were recorded as adherent under it; or that every patient in the cohort was prescribed an oral anticoagulant.

164. None of those facts has been disclosed to any patient in the Ablation Study, to any treating clinician, to the journal, or to any research-integrity body. The assessments have not been produced. The Ablation Study's own data availability statement declares that no data are available.

165. Nihon obtained approval for the Ablation Study from the Clinical Research Judging Committee of Nihon University Itabashi Hospital on July 12, 2019, approval no. RK-190514-1, on an opt-out basis. The one hundred thirty-three patients did not individually consent to participate. They were enrolled upon their institution's assurance that the research would be conducted for their benefit and without avoidable harm to them. Those are the obligations of beneficence and of non-maleficence, and they are owed to the participant rather than to the literature. Beneficence required that the research be conducted for the participants' benefit. Non-maleficence required that it not expose them to unjustifiable risk. Neither obligation ended when the article was published, and neither ended when the article was removed.

166. Every patient in the cohort was prescribed an oral anticoagulant. Non-adherence to oral anticoagulation in atrial fibrillation is a recognized cause of thromboembolic stroke, and the Ablation Study itself concludes that emphasising the

importance of anticoagulant therapy may be a modifiable factor in reducing the risk of recurrence. The authors rested that conclusion upon their patients' adherence to that medication, measured it with an instrument that named no medication at all, and classified it on a rule that recorded a patient within the instrument's medium-adherence band as adherent. How many of the one hundred seven patients recorded as adherent scored six or seven has never been determined.

167. Each patient was assessed twice, within one week before ablation and one year after. Two hundred sixty-six assessments were administered, and two hundred sixty-six occasions arose on which a patient who was not taking an anticoagulant as prescribed could have been identified, told, and reported to the clinician responsible for that patient's care. None was. The assessments exist. Nihon holds them. They can be re-scored. Until they are, the identity of every patient whose medium adherence was recorded as good adherence remains unknown to that patient's clinician, and remains unknown for the reason that the record which would have disclosed it was removed rather than corrected.

**PART FIVE — VALIDITY, PATIENT SAFETY, AND CONTINUING CONDUCT**

**Y. The Instrument Was Not Fit for the Use to Which Defendants Put It**

168. The published validation on which a flat summation of the MMAS-8 rests (Morisky, Ang, Krousel-Wood & Ward, J. Clin. Hypertens. 2008;10:348–354) was retracted on August 18, 2023 (DOI 10.1111/jch.14718), the journal having concluded, on independent statistical review, that the reported sensitivity and specificity of the MMAS-8 were misleading.

169. That concern had earlier been placed on the public record in a letter to the same journal published August 21, 2021 (Ortiz, DOI 10.1111/jch.14353). On the reconstruction set out in that letter, the sensitivity reported in the 2008 validation—approximately 93 percent—could not be reproduced from the data reported; the reconstructed sensitivity was approximately 38 percent, with a 95 percent confidence

interval of 34 to 41 percent.

170. A screening instrument operating at that sensitivity misses the majority of the patients it is deployed to identify. The 2021 protocol article nevertheless asserts to its readers, on the authority of the 2008 validation, that the MMAS-8 is a reliable and valid measure of adherence.

171. DialBetesPlus is not a questionnaire. It is a self-management support system whose stated purpose is the management of care for patients with type 2 diabetes and diabetic kidney disease, including the management of their medication regimens. Patient data is transmitted to a central server, evaluated against clinical guideline targets, and managed by health care providers. Values falling outside defined thresholds are reported to the research team, which informs the patients' attending physicians.

172. Within that system, and within the trial that validated it, the MMAS-8 was the measure of whether a patient was taking the medication on which the entire intervention depended.

173. A patient whose glycemic control is deteriorating has two possible explanations: the treatment is not working, or the patient is not taking it. The adherence measure is what distinguishes them. An adherence measure that fails to detect non-adherence does not merely produce a poor data point. It tells the clinician that the patient is taking the medication when the patient is not, and directs attention away from the one intervention that would help.

174. Each Defendant compounded that defect in the same way, by discarding the scoring and coding the license exists to require. The Morisky Widget separates the intentional and unintentional components of non-adherence and assigns a three-tier adherence coding, so that a patient who has stopped taking a medication deliberately is distinguished from one who forgets, and a patient of medium adherence is distinguished from one of high adherence. A flat summation collapses all of that into a single number and, when cut at a threshold, records every patient

above the cut as adherent.

175. The patients in the DialBetesPlus trial had type 2 diabetes with moderately increased albuminuria—early-stage diabetic kidney disease, in which adherence bears directly on progression to end-stage renal disease, cardiovascular events, and death. The patients in the Heart Failure Study had heart failure. The patients in the Ablation Study had atrial fibrillation, a population in which adherence to anticoagulant therapy bears directly on the risk of stroke.

176. MMAS Research licenses the Morisky Widget on the condition that scoring and coding be performed within the software precisely because the consequence of a misclassified patient is borne by that patient.

**Z. Continuing Conduct**

177. The 2021 protocol article, bearing the false certification that permission was obtained and that the scoring and coding were performed within the Morisky Widget, remains published, indexed, and freely reproducible today.

178. The registry entries for the accused studies remain published today. On information and belief, they continue to list the MMAS-8 among the studies' outcomes, continue to report the studies as suspended or ongoing, and continue to report their results as unpublished.

179. No Defendant has withdrawn, corrected, or amended any of the foregoing. The MMAS-8 assessments administered in these studies have never been re-scored or re-coded in the Morisky Widget. The patients whose adherence may have been misclassified have not been identified. Their treating clinicians have not been alerted.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT (AS TO DEFENDANT KAMEDA)

180. MMAS Research realleges and incorporates each preceding paragraph as though fully set forth herein.

181. The License is a valid and binding contract between MMAS Research and Kameda. MMAS Research performed all conditions, covenants, and promises

required of it, or was excused from performance.

182. Kameda breached Clause I.F by failing to score, code, and report the results of the MMAS-8 assessments administered in the Heart Failure Study through the Morisky Widget, and by instead scoring and coding those assessments manually and outside the Morisky Widget.

183. Kameda breached Clause I.B by extending the use of the Morisky Widget and its scoring and coding criteria outside Medical Corporation Tesshokai, to UT, and by permitting UT personnel holding no Morisky Widget training or certification to administer, score, and code MMAS-8 assessments.

184. Kameda breached Clause I.C by extending the Morisky Widget to an organization outside Medical Corporation Tesshokai without any agreement between MMAS Research and Kameda on terms for training, certification, or the pre-payment of tests.

185. Kameda breached Section II by using a translation of the copyrighted work for an unauthorized purpose, and by publishing information concerning the Heart Failure Study on the Japanese clinical trials registry without the copyright notification and citation the License required.

186. Kameda's breaches were material. The requirements that assessments be scored, coded, and reported through the Morisky Widget, that use be confined to trained and certified Medical Corporation Tesshokai personnel, and that no outside organization receive the Widget without MMAS Research's agreement, are the terms on which MMAS Research licensed the work at all.

187. As a direct and proximate result of Kameda's breaches, MMAS Research has been damaged in an amount to be proven at trial, including the value of the license and sub-license consideration Kameda never paid and MMAS Research never agreed to forgo, the value of the training and certification the License required and Kameda circumvented, and the costs of the corrective work necessary to restore the integrity of the affected assessments.

## SECOND CLAIM FOR RELIEF

## COPYRIGHT INFRINGEMENT (17 U.S.C. § 501) (ALL DEFENDANTS)

188. MMAS Research realleges and incorporates each preceding paragraph as though fully set forth herein.

189. MMAS Research is the owner of United States Copyright Registration No. TX 8-816-517 for the Morisky Widget. The registration is prima facie evidence of the validity of the copyright and of the facts stated in the certificate under 17 U.S.C. § 410(c), and MMAS Research's ownership has been confirmed by the Ninth Circuit in No. 23-55202.

190. The protected expression in the Morisky Widget consists of the original authorship contributed under 17 U.S.C. § 103(b)—the program's algorithmic logic and the selection, coordination, and arrangement of its scoring and coding—and does not depend on any protectability of any preexisting scale.

191. Kameda's license granted it a limited use of that expression, conditioned on scoring, coding, and reporting all assessments through the Morisky Widget, on confining use to trained and certified Medical Corporation Tesshokai personnel, and on obtaining MMAS Research's agreement before extending the Widget to any outside organization. Kameda acted outside the scope of that license. It reproduced and used the protected scoring and coding expression in assessments it scored and coded manually rather than through the Widget, and it distributed that expression to UT, which held no license.

192. UT and Nihon held no license and no authorization of any kind. Every use each made of the Morisky Widget MMAS-8 was unauthorized.

193. Each Defendant reproduced the protected expression by preparing and administering the Morisky Widget MMAS-8 to patients in the studies described above.

194. UT and Nihon distributed and publicly displayed the protected expression by publishing the accused articles, by depositing them in public repositories, and, in

UT's case, by licensing them for unrestricted worldwide reproduction.

195. Each Defendant prepared unauthorized derivative works under 17 U.S.C. § 106(2) by altering the licensed methodology as administered—substituting a flat summation, or a two-tier cut derived from it, for the Widget's validated three-tier scoring and coding. Nihon further prepared an unauthorized derivative work by preparing, reproducing, and distributing a Japanese-language translation of the instrument.

196. Acts of reproduction, distribution, and public display occurred in and had effect in the United States, including through publication, distribution, and public display on the Wiley Online Library at onlinelibrary.wiley.com and the subsequent withdrawal of the article on that platform, deposit in a United States repository, and the storage and processing of assessment data on servers located in California.

197. As a direct and proximate result of Defendants' infringement, MMAS Research has been damaged. MMAS Research is entitled to recover its actual damages and any additional profits of Defendants under 17 U.S.C. § 504(b), or, at its election, statutory damages under 17 U.S.C. § 504(c), and, to the extent the evidence establishes that the infringement was willful, enhanced statutory damages. MMAS Research is further entitled to injunctive relief under 17 U.S.C. § 502, and to costs and attorneys' fees under 17 U.S.C. § 505.

198. As to UT, the measure of MMAS Research's actual damages is not the per-assessment price at which it sells testing capacity to clinics. UT used the work as the adherence metric within evaluations of software UT had developed inside commercially sponsored programs, and to generate the published evidence base for that software. The value of the use is the value of a license negotiated for that purpose, on the terms MMAS Research imposes for commercial validation use. The benefit UT obtained includes the published finding that its software achieved its primary endpoint, the value of that finding to UT and to the commercial sponsors of the programs within which the software was developed, and the continued availability of

that finding in the scientific literature.

## THIRD CLAIM FOR RELIEF

## FALSIFICATION AND REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION (17 U.S.C. § 1202) (AS TO DEFENDANT UT)

199. MMAS Research realleges and incorporates each preceding paragraph as though fully set forth herein.

200. The statement set out above is copyright management information under 17 U.S.C. § 1202(c). It conveys the title and identification of the work, the name of the copyright owner, the identifying registration number of the work, and the terms and conditions for use of the work.

201. UT provided and distributed that copyright management information in a false form. The 2021 protocol article states that the MMAS-8 scoring and coding presented in it were done using the electronic Morisky Widget MMAS-8 Software, and that permission for that use was required and was obtained for the research. Neither statement was true.

202. UT provided that false information knowingly. UT knew that it had never obtained a license or permission from MMAS Research. It knew, through the two individuals it presented for MMAS Research's training and certification, that use of the work requires a license and that every assessment must be scored and coded within the Widget. And it knew that the assessments reported in the article had not been so scored or coded.

203. UT provided and distributed that false information with the intent to induce, enable, facilitate, or conceal infringement. A published certification that permission was obtained and that the licensed software was used forecloses inquiry into whether either was true, and permits the unauthorized use to continue undetected and to be republished by others.

204. UT compounded that conduct by publishing the article under a Creative Commons Attribution license, thereby distributing the false copyright management

information to the public at large with an unrestricted right of further reproduction.

205. UT further distributed a figure taken from the 2021 protocol article in its 2024 results article without the copyright management information the protocol article carried, and published the 2024 results article reporting the trial without any reference to MMAS Research, the Morisky Widget, or Registration No. TX 8-816-517, while expressly acknowledging the license of another instrument used in the same trial.

206. MMAS Research has been injured by UT's violations of 17 U.S.C. § 1202 and is entitled to the remedies provided by 17 U.S.C. § 1203, including actual damages and any additional profits of UT, or, at its election, statutory damages of not less than $2,500 and not more than $25,000 for each violation, together with injunctive relief, costs, and attorneys' fees.

**FOURTH CLAIM FOR RELIEF**

**TRADE SECRET MISAPPROPRIATION (18 U.S.C. § 1836, DTSA)**

**(ALL DEFENDANTS)**

207. MMAS Research realleges and incorporates each preceding paragraph as though fully set forth herein.

208. MMAS Research owns trade secrets in the Morisky Widget scoring and coding criteria, as alleged above. Those trade secrets relate to products and services used in, and intended for use in, interstate and foreign commerce.

209. MMAS Research has taken reasonable measures to keep the scoring and coding criteria secret, including never publishing them, embedding them in access-controlled software, disclosing them only to personnel who complete MMAS Research's training and certification program, requiring that all scoring and coding be performed within the Morisky Widget, prohibiting transfer of access outside a licensed organization, and conditioning any extension to an outside organization on MMAS Research's agreement.

210. The scoring and coding criteria derive independent economic value from

not being generally known to, and not being readily ascertainable by proper means by, others who could obtain economic value from their disclosure or use.

211. Kameda acquired the criteria lawfully, through the training and certification MMAS Research provided in Kamogawa City in 2017, and acquired them subject to a duty to use them only within the limits of the License. Kameda misappropriated them by disclosing them, without express or implied consent, to co-investigators at UT, at a time when Kameda knew or had reason to know that it owed a duty to limit their use and that UT held no license, training, or certification.

212. UT acquired the criteria in part through MMAS Research's own training and certification of two UT personnel in August 2018 in connection with the DialBetesPlus study, and in part from persons who held them subject to a duty to maintain their secrecy and to limit their use. In each case UT acquired them under circumstances giving rise to a duty to limit their use to the Morisky Widget, and at a time when UT knew or had reason to know that it held no license of its own. UT used them to administer, score, and code MMAS-8 assessments in the studies described above, outside the Morisky Widget, and continues to derive benefit from that use through the publications reporting those studies.

213. Nihon acquired and used the criteria without MMAS Research's consent and by improper means, and used them to administer, score, and code MMAS-8 assessments reported in the Ablation Study.

214. As a direct and proximate result of Defendants' misappropriation, MMAS Research has suffered and will continue to suffer damages. MMAS Research is entitled to recover its actual loss and any unjust enrichment, or in the alternative a reasonable royalty, under 18 U.S.C. § 1836(b)(3), to injunctive relief, and, to the extent the evidence establishes willful and malicious misappropriation, exemplary damages and attorneys' fees. As to UT, the unjust enrichment to be recovered includes the value UT derived from applying the criteria to generate adherence data within evaluations of software UT developed and owns.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MMAS Research LLC prays for judgment against Defendants as follows:

A. For damages for breach of contract against Defendant Kameda in an amount according to proof at trial;

B. For MMAS Research's actual damages and any additional profits of Defendants attributable to the infringement, or, at MMAS Research's election, statutory damages, under 17 U.S.C. § 504;

C. For MMAS Research's damages under 17 U.S.C. § 1203 against Defendant The University of Tokyo, or, at MMAS Research's election, statutory damages of not less than $2,500 and not more than $25,000 for each violation of 17 U.S.C. § 1202;

D. For MMAS Research's actual loss and any unjust enrichment, or in the alternative a reasonable royalty, and, upon proof of willful and malicious misappropriation, exemplary damages, under 18 U.S.C. § 1836(b)(3);

E. For preliminary and permanent injunctive relief restraining Defendants, and all persons acting in concert with them, from reproducing, distributing, publicly displaying, administering, scoring, coding, translating, or preparing derivative works of the Morisky Widget or the Morisky Widget MMAS-8 without authorization from MMAS Research, from further disclosing the Morisky Widget scoring and coding criteria, and from further publishing or distributing the false copyright management information identified herein;

F. For an order requiring Defendants to take such steps as are necessary to correct the scientific and registry record, including the removal of the false copyright management information and the publication of a correction identifying that no license or permission was held and that the reported assessments were not scored or coded within the Morisky Widget;

G. For an order requiring Defendants to account for all MMAS-8 assessments

administered in the studies identified herein, and to correct the scoring, coding, and reporting of those assessments;

H. For costs of suit;

I. For attorneys' fees under 17 U.S.C. §§ 505 and 1203 and 18 U.S.C. § 1836(b)(3);

J. For prejudgment interest as allowed by law; and

K. For such other and further relief as the Court deems just and proper.

Dated: September 8, 2026

Respectfully submitted,

**HANKIN PATENT LAW, APC**

/Marc E. Hankin/

MARC E. HANKIN
Attorneys for Plaintiff.
**MMAS RESEARCH LLC**

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED: September 8, 2026 **HANKIN PATENT LAW, APC**

/Marc E. Hankin/

MARC E. HANKIN
Attorneys for Plaintiff.
**MMAS RESEARCH LLC**